Stuart MARSH, Plaintiff,

v.

BOARD OF EDUCATION OF CITY OF FLINT, a Public Corporation; Leo Macksood, individually and as President of the Board of Education of the City of Flint; United Teachers of Flint, Inc., a Michigan Corporation; Harold Keim, individually and as President of United Teachers of Flint, Inc.; Lane Hotchkiss, individually and as Chief Negotiator and Grievance Officer of United Teachers of Flint, Inc., Defendants.

No. 80–40349.

United States District Court,
E.D. Michigan, S.D.

March 7, 1984.

Bruce A. Newman, Flint, Mich., for plaintiff.

C. Rees Dean, Flint, Mich., Thomas A. Baird, Lansing, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER

NEWBLATT, District Judge.

"Again and again Federal judges have spoken out, above a popular din or a Klansman's roar, as protectors of constitutional rights."[1]

I FACTS

A glorious new era dawned in the history of the American federal courts on February 20, 1961. On that date the Supreme Court rendered its decision in *Monroe v. Pape*,[2] and thus raised up the sleeping Lazarus of 42 U.S.C. § 1983.

*Monroe* lit up the darkness that all too often descends when government power goes unchecked by the judiciary. *Monroe* signalled that individuals in America—by virtue of section 1983—can obtain monetary and injunctive relief from the excesses of government.

It is not surprising that it has been the powerless—racial minorities, women, employees and prisoners—who have benefitted most from section 1983. It also is not surprising that section 1983 plaintiffs typically choose the federal courts as the forum in which to litigate their claims. Federal judges are insulated from political pressures by Article III of the constitution. In theory at least, society is prevented from intimidating federal judges from upholding the law. It thus is easy to understand why a lone plaintiff—supported by nothing more than the abstract principles codified in the constitution and civil rights

laws—would assert to the limit his right to a federal court forum.

The case presently before this Court is a civil rights action. Stuart Marsh—the plaintiff—is a white man. But the constitution and the civil rights laws seem to guarantee that color is not relevant and that the government cannot confer benefits nor visit burdens on account of race. Stuart Marsh now asks the Court to make good on this guarantee.

Mr. Marsh, fifty-nine years of age, has been employed by the Flint Board of Education since 1965. After obtaining the appropriate credentials, he was promoted in 1969 to the position of counselor.

Mr. Marsh performed his duties ably and was continued in the counselor position until 1980. In that year, Mr. Marsh was suddenly informed that he would no longer occupy a counselor's position and that he would be required to resume duties as a classroom teacher.

Mr. Marsh's demotion resulted from the operation of an affirmative action program designed to maintain a specified quota of black counselors in the Flint secondary school system. The pertinent affirmative action provision is set out in Article XIV, section I–1(c) of the 1979–1982 collective bargaining agreement[3] entered into by the Flint Board of Education and the United Teachers of Flint. Under this provision, the racial composition of the counselor and librarian staff of the Flint secondary school system is targeted to match the racial composition of the entire secondary teaching staff which in turn is to reflect the student racial composition. In order to maintain the specified quota, at least four black persons with less seniority than Mr. Marsh were retained as counselors in the 1980–1981 school year. It is not contested that

---

**1.** The quotation is taken from a December 14, 1983 New York Times editorial entitled "Democracy's Elite." The Court gratefully acknowledges that the article was called to its attention by the Honorable Avern Cohn, a federal judge who sits in the Eastern District of Michigan.

**2.** *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

**3.** A copy of the collective bargaining agreement is filed as Exhibit 12 at docket entry # 22. It is interesting to note that the agreement contains additional affirmative action provisions to Article XIV, section I–1(c). *See e.g.,* Appendix W to Exhibit 12. The only provision presently before the Court, however, is Article XIV, section I–1(c).

these individuals were retained as counselors over Mr. Marsh on account of race.

In an effort to obtain redress, Mr. Marsh filed this lawsuit suing the following defendants: the Flint Board of Education; Leo Macksood, the President of the Board of Education; the United Teachers of Flint; Harold Keim, the President of the United Teachers of Flint; and Lane Hotchkiss, the chief negotiator and grievance officer of the United Teachers of Flint. Plaintiff's claims against Messrs. Keim and Hotchkiss have been dismissed in earlier orders of the Court. The remaining defendants are the Flint Board of Education, Mr. Macksood and the United Teachers Union.

Plaintiff has asserted 42 U.S.C. §§ 1981, 1983 and 1985(3) claims against the Board of Education and Mr. Macksood. Plaintiff alleges that the Board and Macksood applied an explicit racial classification in employment thereby violating both section 1981 and the equal protection clause of the Fourteenth Amendment. Plaintiff asserts his equal protection clause claim by way of 42 U.S.C. § 1983. Plaintiff also alleges that the Board and Mr. Macksood conspired to deprive him of rights protected by 42 U.S.C. § 1985(3). Finally, plaintiff alleges that the union—defendant United Teachers of Flint—violated 42 U.S.C. § 1981 by entering into the race based affirmative action agreement.

There are only minor disputes in the facts,[4] and since the essential facts relative to plaintiff's legal theories are beyond doubt established, it is entirely appropriate to resolve now, without a trial, the issue of whether plaintiff is or is not entitled to relief. Pending herein are motions for summary judgment filed by the three remaining defendants. The thorough and scholarly briefs filed by the very able counsel have been read. The Court also has ever so carefully studied and reflected upon the applicable body of law in dealing with the pending motions which are now before the Court.

## II LEGAL ANALYSIS

### A. *Plaintiff's 42 U.S.C. § 1985(3) Claim Against Defendants Board of Education and Macksood*

Plaintiff contends that the affirmative action plan at issue here operated to violate 42 U.S.C. § 1985(3). Resolving this issue requires construction of a statute famous for its opaque language. Assistance is afforded by some rather instructive precedent, for while section 1985(3) is not litigated as often as section 1983, it still has been the subject of a number of full Supreme Court opinions.[5]

Section 1985(3) protects against conspiracies aimed at certain classes of persons. Arguably there are two alternative reasons why plaintiff Marsh's section 1985(3) claim should be dismissed via summary judgment.

First, it is noted that plaintiff's section 1985(3) claim arises out of a so-called conspiracy to racially discriminate against him in employment. In the case *of Great American Federal Savings v. Novotny*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979), the Supreme Court held that a person asserting a Title VII[6] claim of employment discrimination cannot also assert a claim under 42 U.S.C. § 1985(3). The *Novotny* court's language provided that

"deprivation of a right created by Title VII cannot be the basis for a cause of action under section 1985(3)."[7]

Here, plaintiff never asserted a Title VII claim. Although Title VII—by dint of the

---

4. *See* pp. 2–3 of plaintiff's supplemental brief at docket entry #28.

5. *See e.g., United Brotherhood of Carpenters and Joiners v. Scott,* —— U.S. ——, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983); *Great American Savings & Loan Association v. Novotny,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979); *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971).

6. *See Great American Savings & Loan Association v. Novotny,* 442 U.S. 366, 378, 99 S.Ct. 2345, 2352, 60 L.Ed.2d 957 (1979).

7. Title VII of the 1964 Civil Rights Act, codified at 42 U.S.C. § 2000e *et seq.* Title VII is, of course, one of the major employment discrimination statutes.

1972 amendments [8]—has been extended to cover public employers, plaintiff Marsh chose to rely solely on sections 1981 and 1983 rather than section 1985.

If *Novotny* were read to encompass all employment discrimination claims, dismissal of the section 1985(3) claim outright would be compelled. But as mentioned, *Novotny* deals with rights created by Title VII. Here, plaintiff's asserted right was not created by Title VII. Plaintiff is here asserting his equal protection clause right to be free from race based governmental discrimination. The genesis of this right is, of course, the dictum in the famous (or more appropriately, infamous) *Korematsu* [9] decision. By the time of the 1954 *Brown v. Board of Education* [10] decision, the right was firmly embedded in the equal protection clause.

In sum, plaintiff's racial discrimination claim was created by the Constitution rather than Title VII. It follows that *Novotny* does not mandate dismissal of plaintiff's section 1985(3) claim.

A more formidable defense is that plaintiff—under the facts of this case—is not within the protective ambit of section 1985(3). Recently, in *United Brotherhood of Carpenters and Joiners of America v. Scott*, ── U.S. ──, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983), the Supreme Court rendered an important opinion dealing with the protective scope of section 1985(3). *Scott* makes it clear that section 1985(3) only affords protection where the alleged conspiracy has a race or class based animus.

Section 1985(3) is the former section 2 of the Ku Klux Klan Act of 1871. [11] The Supreme Court has devoted hundreds of pages to analyzing the legislative history of this Act. [12] These discussions and this Court's own study of the 1871 Act [13] leave this Court entirely convinced that the overriding purpose of the Act was to protect the newly freed blacks from Ku Klux Klan violence and intimidation.

■ Affirmative action is a modern phenomenon dating from the post World War II civil rights movement. Unlike the legislative debates surrounding Title VII of the 1964 Civil Rights Act, the debates concerning section 1985(3) do not reveal even a trace of concern over the issue of affirmative action. This is not to say that whites can under no circumstances enjoy the protection of this statute. Clearly, racial attacks against whites or other forms of concerted mob violence would be covered under section 1985(3). Here, however, the conclusion is compelled that it was not the statute's objective to strike down employment related affirmative action.

■ Before leaving this issue it is appropriate to stress that the Court is involved in statutory—rather than constitutional—interpretation. Consequently, attention is focussed solely on the intent of the 1871 drafters [14] and on higher court

---

**8.** Title VII was amended in 1972. *See* Act of March 24, 1972, 86 Stat. 103.

**9.** *Korematsu v. United States,* 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944).

**10.** *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

**11.** Act of April 20, 1871, § 1, 17 Stat. 13.

**12.** For only a sample of this *see, Briscoe v. LaHue,* ── U.S. ──, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983); *Patsy v. Board of Regents,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982); *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979); *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611

(1978). *See generally* the interesting section on 42 U.S.C. § 1983 in the new (fourth) edition of Professor Wright's Handbook on Federal Courts at § 22A. *See also* Blum, *From Monroe to Monell: Defining the Scope of Municipal Liability in Federal Courts,* 51 Temple Law Quarterly 409 (1978). Comment, *A Construction of Section 1985(3) in Light of Its Original Purpose,* 46 U.Chi.Law Rev. 402 (1979).

**13.** *See e.g., Riley v. Smith,* 570 F.Supp. 522, 525–526 (ED Mich.1983); *Clark v. Michigan Department of Corrections,* 555 F.Supp. 512, 514–517 (ED Mich.1982).

**14.** It is basic that statutory intent should be the only inquiry in judicial statutory construction. *See Moll v. Parkside Livonia Credit Union,* 525 F.Supp. 785, 786 (ED Mich.1981). To quote

interpretative decisions. The inquiry would be different were a constitutional provision at issue. This Court does not believe in strict historical interpretavism as championed by Professor Berger.[15] Instead, it is inclined toward a modified interpretavism with basic original principles as the guide but allowing for reasonable and natural expansion over time.[16] Under this approach the challenged affirmative action plan might very well fall if the Court were originally deciding the constitutional issue.[17] Here, however, the Court merely construes a statute, and easily arrives at the conclusion that, under the undisputed facts of this case, summary judgment must be granted on plaintiff's section 1985(3) claim.

### B. *Plaintiff's 42 U.S.C. § 1981 Claim*

Plaintiff also has asserted a 42 U.S.C. § 1981 claim. Section 1981 first appeared as section 1 of the Civil Rights Act of 1866.[18] Like section 1985(3), section 1981 was intended to ameliorate the lives of the

recently freed blacks of the south.[19] It follows that if the Court were construing this statute afresh, the Court's analysis would be very similar to the foregoing section 1985(3) analysis.

The Sixth Circuit Court of Appeals, however, has explicitly directed that in affirmative action cases, section 1981 is to be read as proscribing or permitting the same degree of affirmative action as the equal protection clause.[20] This reminds the Court of the famous *Bakke* case where five members of the United States Supreme Court held that Title VI of the 1964 Civil Rights Act runs parallel to the constitution's equal protection clause.[21] The Court must confess that it has trouble with this approach. Unless a statute explicitly incorporates the constitution—akin to 42 U.S.C. § 1983—the statute's meaning over time is bound to differ from the meaning of the constitution. This is because the constitution must evolve and grow with the needs of changing eras.[22] Nevertheless, the Sixth Circuit has spoken, and this Court is

John Hart Ely, if a judge behaves otherwise people should

> "conclude that he was not doing his job, and might even consider a call to the lunacy commission."

See Ely, *Democracy and Distrust: A Theory of Judicial Review*, 3 (1980).

**15.** *See generally* R. Berger, *Government By Judiciary* 10–12 (1980). Professor Berger's is the classic presentation of the strict interpretavist position.

**16.** *See generally*, Grano, *Judicial Review and A Written Constitution*, 28 Wayne Law Rev. 1 (1981). *See also* Grano, *Rhode Island v. Innis, A Need to Reconsider the Constitutional Premises Underlying the Law of Confessions*, 17 American Criminal Law Rev. 3–4 n. 19 (1979).

**17.** *See* nn. 50–73 and accompanying text *infra*.

**18.** Act of June 27, 1866, 14 Stat. 74.

**19.** *See Runyan v. McCray*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976). *See generally* Comment, *Developments in the Law*—Section 1981, 15 Harv.C.R.C.L.Law Rev. 29 (1980).

**20.** *See Ohio Contractors Association v. Keip*, 713 F.2d 167 at 175 (CA6, 1983); *Detroit Police Officers Association v. Young*, 608 F.2d 671, 692 (CA6, 1981).

**21.** In *Bakke*, four justices—Justices Burger, Stewart, Stevens and Rehnquist—would have struck down the Cal-Davis medical school affirmative action program on the ground that it violated Title VI of the 1964 Civil Rights Act. These Justices never reached the constitutional issue. *See Regents of the University of California v. Bakke*, 438 U.S. 265, 408–421, 98 S.Ct. 2733, 2808–2815, 57 L.Ed.2d 750 (1978).

Justices Brennan, Marshall, Blackmun and White upheld the Davis plan under the equal protection clause. These Justices concluded that

> "Title VI goes no further in prohibiting the use of race than the Equal Protection Clause of the Fourteenth Amendment itself."

See *id* at 325, 98 S.Ct. at 2766. Justice Powell, in his noted *Bakke* swing opinion, took the same position. *See id* at 286–287, 98 S.Ct. at 2746.

**22.** Only a few observers would question this. *But see* R. Berger, *Government by Judiciary* (1980). The burning issue of modern constitutional law is the source of values that is to guide the historical evolution of the constitution. *See generally* Ely, *Democracy and Distrust: A Theory of Judicial Review* (1980); Grano, *Judicial Review and A Written Constitution*, 28 Wayne Law Rev. 1 (1981); Perry, *Non Interpretive Review in Human Rights Cases: A Functional Justification*, 56 NY U.Law Rev. 278 (1981); Tribe, *The Puzzling Persistence of Process-Based Constitutional Theories*, 89 Yale Law Journal 1037 (1980).

bound to obey. Therefore, the Court simply incorporates its analysis of the equal protection clause claim that is set out in section II–C of this opinion. The disposition of the section 1981 claim will be exactly the same as the disposition of plaintiff's section 1983 equal protection clause claim which will now be addressed.

## C. Plaintiff's 42 U.S.C. § 1983 Equal Protection Clause Claim

The equal protection clause is the constitutional provision that deals with racial classifications enacted or otherwise advanced by the government.[23] Over time the equal protection clause claim has evolved such that it now proscribes other types of governmental classifications.[24] Nevertheless, the classic equal protection clause claim is that of racial discrimination.

In the present case the Court has been called upon to apply the equal protection clause to the Board of Education's affirmative action program for black counselors. The key precedent—the precedent that will guide much of this section of this opinion—is the recent Sixth Circuit case of Bratton v. City of Detroit.[25] In Bratton, a Sixth Circuit panel consisting of Judges Jones, Merritt and Celebrezze decided the legality of the portion of the Detroit Police Depart-

ment's affirmative action plan that establishes separate lists for black and white officers with respect to promotions from the rank of sergeant to the rank of lieutenant.[26] Bratton upheld the Detroit Police Department's affirmative action program. In the process, the Bratton panel set out definite guidelines for analyzing affirmative action equal protection clause claims.

Bratton dictates a two-step equal protection clause affirmative action analysis.[27] This analysis will now be employed to determine whether the Board's affirmative action program passes constitutional muster.

■ The first step of the Bratton analysis focuses on whether prior discrimination has created a genuine need for racial preferences. In resolving this issue, the reviewing court must carefully consider whether there is a sound basis for believing that minority group underrepresentation is "chronic." [28]

Before analyzing this issue, it is most appropriate to take a moment to look back over the wide horizon of employment discrimination law. This will be helpful in placing the Bratton first step in the proper perspective.

The classic employment discrimination case is one of disparate treatment based on

**23.** See University of California Regents v. Bakke, 438 U.S. 265, 282–286, 98 S.Ct. 2733, 2744–2746, 57 L.Ed.2d 750 (1978) (opinion of Justice Powell).

**24.** See e.g., Craig v. Boren, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (heightened judicial scrutiny for gender based state laws); Weber v. Aetna Casualty & Surety Co., 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972) (heightened judicial scrutiny for state laws discriminating against illegitimate children). See generally Perry, Modern Equal Protection: A Conceptualization and An Appraisal, 79 Columbia Law Rev. 1023 (1979); Weidner, The Equal Protection Clause: The Continuing Search for Judicial Standards, 57 U.Det.J.Urb.L. 867 (1980).

**25.** 704 F.2d 878 (CA6) on rehearing, 712 F.2d 222 (CA6, 1983). A petition seeking certiorari was filed in Bratton and was denied by the Supreme Court on January 9, 1984. See —— U.S. ——, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984). It should perhaps be noted that the Supreme Court has granted certiorari and has recently

heard oral arguments in the affirmative action oriented Sixth Circuit case of Firefighters v. Stotts, # 82–206 (argued on December 6, 1983). The Stotts Sixth Circuit opinion—published at 679 F.2d 541 (CA6, 1982)—held that a district court may modify a consent decree to prevent layoffs from reducing the quota of minority firefighters specified in the consent decree.

Although very interesting, the Stotts issues are markedly different from the issues in the present case. Therefore, this opinion will not mention Stotts again.

**26.** A prior Sixth Circuit opinion—Detroit Police Officers Association v. Young, 608 F.2d 671 (CA6, 1979) cert. den'd, 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981)—upheld the validity of the patrolman to sergeant portion of the Detroit Police Department affirmative action plan.

**27.** See Bratton v. City of Detroit, 704 F.2d 878, 884–898 (CA6, 1983).

**28.** See id at 886.

race. In such a case the victim persuades the fact finder—which usually is a court—that individualized intentional discrimination has occurred.[29] This simple model—applicable to people like Adolph Plessy, Linda Brown, Alan Bakke and Brian Weber[30]—operates to rectify intentional and invidious racial discrimination directed at identifiable victims. Clearly, *Bratton* is not referring to this type of discrimination. If it were, the identifiable black victims of past discrimination could be pinpointed and awarded appropriate redress which may or may not have disadvantaged white persons. *Bratton*, however, refers to a much more general type of discrimination.

A second model of discrimination that has been recognized in employment discrimination law is pattern and practice discrimination. This type of discrimination—paradigmed in the famous *Teamsters*[31] case—involves systematic discrimination against a bounded set of workers occurring within a statute of limitations.

The *Teamsters* model is not nearly as discrete as the simple single victim discrimination model. Nevertheless, the *Teamsters* standard is much more difficult to meet than the standard specified in the first step analysis set forth in *Bratton*. Indeed, the *Bratton* panel hearkened to evidence of segregation in Detroit police practices that occurred "as far back as the city's first race riot in 1943."[32] When one considers the tragic American history in the area of race relations, it becomes obvious that virtually *every* industry and activity in both the public and private sectors located in states in which a substantial minority population has resided will fall within the *Bratton* standard of past discrimination. Indeed, *Bratton* prior discrimination is virtually equivalent to "societal discrimination" as discussed in Justice Brennan's *Bakke* opinion.[33]

■ Having determined just what it is applying, the Court is now prepared to apply the *Bratton* first step. In this respect careful note must be taken of the undisputed statistics in the record. These statistics clearly indicate that, for at least in excess of twenty years, black people have been substantially underrepresented in the teaching and counseling sectors of the Flint school system. In 1959, for example, there were only twelve black teachers in the district's junior high schools and four black teachers in the district's high schools.[34] Furthermore, as the number of black teachers increased, these teachers were usually assigned to schools with predominantly black student populations.[35] By 1980, 59.2% of the district's students were black while only 31% of the district's city's teachers were black.[36]

The school district's record on the issue of black counselors was even less impressive. The first black counselor was not hired until 1963. In 1966, of fifty-five

---

**29.** The basic disparate treatment single plaintiff model is discussed and analyzed in several Supreme Court cases. *See e.g., U.S. Postal Service v. Aikens*, —— U.S. ——, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Furnco Construction Co. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

**30.** The plaintiffs in the famous racial discrimination cases of *Plessy v. Ferguson*, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896); *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); *University of California Regents v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978); *United Steelworkers of America v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979).

**31.** *See Teamsters v. U.S.*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

**32.** *See Bratton v. City of Detroit*, 704 F.2d 878, 888 (CA6, 1983).

**33.** *See University of California Regents v. Bakke*, 438 U.S. 265, 318, 98 S.Ct. 2733, 2762, 57 L.Ed.2d 750 (1978).

**34.** *See* Exhibit 1, p. 2 in the sheaf of Exhibits attached to defendants' March 14, 1983 brief at docket entry #22.

**35.** *See id.*

**36.** *See* affidavit of Stuart A. Boze, at ¶10. The affidavit is at the front of the docket entry #22 sheaf of Exhibits.

counselors, only 3 were black.[37] In 1980, when the district's student population was 59.2% black, fifteen out of fifty-two counselors were black.[38]

In light of all this, there can be no doubt that the present affirmative action plan complies with the first part of the *Bratton* test. While not as compelling as the Detroit Police Department evidence, the School Board has certainly adduced evidence proving that there historically has been substantial underrepresentation of blacks as school counselors. From this the inference can be drawn that there has been a pattern of overt discrimination against blacks as teachers and counselors in the district.

The Court must, however, point out that it is *not* holding that an equal protection clause section 1983 racial discrimination claim could be sustained on this record by the black counselors in the Flint school system. Such a claim would be subject to a statute of limitations and rather rigorous evidentiary burdens.[39] Here, it is merely held that the historical discrimination in the school system is enough to qualify as "past discrimination" within the meaning of *Bratton*. Like Justice Stewart's famous *Fullilove* dissent, *see Fullilove v. Klutznick*, 448 U.S. 448, 522–527, 100 S.Ct. 2758, 2797–2800, 65 L.Ed.2d 902 (Stewart J. dissenting), the present opinion recognizes that the type of past discrimination which "justifies" voluntary affirmative action is a far cry from the type of discrimination necessary to sustain an equal protection clause claim.

■ Having concluded that the Board's affirmative action program comports with the first part of the *Bratton* test, the Court moves on to the second prong of the test— to determine whether the affirmative action plan is "reasonable" under *Bratton*.[40] *Bratton* reasonableness is tested by an analysis of two issues.[41] First, the reviewing court must determine whether white people are stigmatized by the minority preferences. Next, it must be determined whether the specific numerical goals of the affirmative action program are reasonable.

As to the stigma issue, the Court recognizes that it has before it one of the great issues of modern times. For in the America of today—from the oil fields of Louisiana to the factories of Detroit—people speak constantly of affirmative action and the effect that the racial preferences have on white people. For the Court to analyze adequately whether whites are really stigmatized by racial affirmative action, a look to the general subjects of race and race based governmental policies is necessary.

Western history—for all its artistic and scientific glories—has been marked by racial strife. Curiously enough, racial conflicts seem to increase, rather than subside, as time moves on. The enslavement of the black race and the subjugation of the American Indian were mere preludes to the murderous racial relations of modern times. Indeed, writing in 1887, the French anthropologist Georges Vacher de Lepouge warned: [42]

> "The conflict of races is now about to start within nations .... I am convinced that in the next century people will slaughter each other by the millions because of a difference of a degree or two in the cephalic index. It is by this sign,

---

**37.** *See* Boze affidavit at ¶ 11 at docket entry # 22 sheaf of Exhibits.

**38.** *See* "Summary Sheet" included with Exhibit A at docket entry # 22. *See also* ¶ 10 of the Boze affidavit at docket entry # 22 sheaf of Exhibits.

**39.** Intentional racial discrimination is tested under the equal protection clause in basically the same manner as it is tested under Title VII. For discussions of the Title VII disparate treatment model, *see U.S. Postal Service v. Aikens*, —— U.S. ——, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983);

*Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207.

**40.** *See Bratton v. City of Detroit*, 704 F.2d 878, 890 (CA 6, 1983).

**41.** *See id.*

**42.** As quoted and translated in Field, *Evangelist of Race: The Germanic Vision of Houston Stewart Chamberlain* (1981).

which has replaced the biblical shibboleth and linguistic affinities, that men will be identified ... and the last sentimentalist will be able to witness the most massive exterminations of peoples." [43]

The strange prophecy of Vacher de Lepouge has been borne out in the twentieth century. The ominous thunder of white hooded night riders, the thick Jim Crow statute books, the gas chamber horrors of Buchenwald, the concentration camps for Japanese-Americans ... all of this comes to mind with the subject of governments that have enacted laws predicated on race.[44]

In light of the past it is not surprising that many people believe that governments should be absolutely forbidden from enacting race based statutes. This view has been eloquently expressed by a number of excellent scholars [45] and has won the endorsement of such judicial luminaries as Justice Rehnquist,[46] Justice Stewart [47], Justice Mosk [48] and Judge Van Graafiland.[49]

The absolute prohibition against government race legislation is bottomed on several sound premises. In this respect it must first be noted that those who are disadvantaged by racial legislation inevitably develop feelings of bitterness and animosity toward the preferred group. It is granted that Justice Blackmun has declared that

"in order to get beyond racism we must first take race into account ... and in order to treat some persons equally we must first treat them differently." [50]

But the conclusion is inescapable that Professor Grano is correct in remarking that "Orwell would have found grist for his mill" [51] in Justice Blackmun's statement. In fact, racial consciousness is dramatically—and perhaps permanently—increased by racial preferences.

It must further be noted that racial preferences often operate to reinforce stereotypes about minority groups. Members of the majority may well infer that minority job holders obtained their positions through favoritism rather than merit. Obviously, this is blatantly unfair to the minority person who would have won the position in a purely competitive job context.

Furthermore, minority preferences are particularly difficult to take when the dis-

---

43. It should never be forgotten that governmental racism was not always the sole product of physical force and coercion. At times certain governments implemented racist policies with a clear majority mandate and with the support of prestigious scholars and writers such as Madison Grant, Joseph Gobineau and Houston Stewart Chamberlain. For a study of the almost mystical influence of Chamberlain's writings on government leaders in the western world, *see* Mr. Field's recent book cited at fn. 42 *supra. See also* Gosset, Race: *The History of an Idea in America.*

44. The present opinion is not the only judicial opinion invoking such metaphors. In his *Fullilove* dissent, Justice Stevens wondered where the affirmative action lawmakers would look for methods to determine what racial group an affirmative action applicant would be placed in. This is what came to Justice Stevens' mind: "If the National Government is to make a serious effort to define racial classes by criteria that can be administered objectively, it must study precedents such as the First Regulation to the Reich's Citizenship Law of November 14, 1935 ..." *See Fullilove v. Klutznick,* 448 U.S. 448, 534 n. 5, 100 S.Ct. 2758, 2804 n. 5, 65 L.Ed.2d 902 (Stevens J. dissenting).

45. *See e.g.,* Bickel, *The Morality of Consent,* 133 (1975); Van Alstyne, *Rites of Passage: Race, the Supreme Court and the Constitution,* 46 U. Chicago Law Rev. 775 (1979).

46. *See United Steelworkers v. Weber,* 443 U.S. 193, 218–254, 99 S.Ct. 2721, 2734–2752, 61 L.Ed.2d 480 (Rehnquist, J. dissenting) (1979).

47. *See Fullilove v. Klutznick,* 448 U.S. 448, 522–527, 100 S.Ct. 2758, 2797–2800, 65 L.Ed.2d 902 (Stewart, J. dissenting) (1980).

48. *See Price v. Civil Service Commission,* 26 Cal.3d 257, 161 Cal.Rptr. 475, 604 P.2d 1365 (Mosk, J. dissenting) (1980).

49. *Local 35 v. City of Hartford,* 22 FEP Cases 1788, 1793–1796 (Van Graafiland, J. dissenting) (1980).

50. *See Regents of the University of California v. Bakke,* 438 U.S. 265, 407, 98 S.Ct. 2733, 2807, 57 L.Ed.2d 750 (1978) (separate dissenting opinion of Justice Blackmun).

51. *See* Grano, Book Review, 26 Wayne Law Rev. 1395, 1402 n. 39 (1980).

appointed white is a member of an ethnic group that has not been traditionally advantaged. White people—particularly whites of European descent—doubtless have many physical traits in common and it would seem to be anthropologically correct to speak of "the white race." But historically—at least since the time of Tacitus—there has never been a nation solely representing the interests of white people or even European people. Instead, the various European nations and ethnic groups have been in conflict, and many of the American ethnic groups have unfortunate histories of persecution and discrimination.

Finally, it must be noted that there is room for real doubt about Judge Jone's statement that there is a national policy in favor of affirmative action.[52] There is a national policy of equal opportunity—but a national policy of racial preferences for minorities certainly is a different matter. Within the past few weeks the reconstructed United States Civil Rights Commission has issued an opinion[53] condemning racial quotas. While the Court readily acknowledges that it has its differences with the present Civil Rights Commission and Justice Department on many civil rights issues,[54] the Court believes that the recent affirmative action statement clearly signals a change in the country's policy on this issue. And the Court believes that the new policy probably represents the position of the majority of Americans.

With these considerations in mind, the Court believes that under a reasonable and logical interpretation of the term there is a "stigma" visited on Stuart Marsh as a result of the racial discrimination that he suffered in this case. In this case, however, the Court is not construing afresh the term "stigma." Instead, the Court's inquiry is much narrower. The Court must only decide whether Marsh has been stigmatized under the rather puzzling definition of stigma given in the *Bratton* opinion.

 Under the *Bratton* definition of stigma, a white person is not stigmatized if the purpose of the affirmative action program is to aid blacks rather than to exclude whites.[55] This distinction, which has been advocated and elaborated upon in the scholarly writings of Professor Sedler,[56] cannot be particularly important to Mr. Marsh. Furthermore, it will be recalled that the purpose of Jim Crow laws was to preserve the cultural and biological "purity" of the white race rather than to penalize and stigmatize blacks. Nevertheless, having been told that a certain purpose can justify racial discrimination, the Court acknowledges that the exonerating purpose is present here. The purpose of the City's affirmative action plan is to uplift blacks. Therefore, *Bratton* compels the conclusion that plaintiff Marsh has not been stigmatized!

---

**52.** *See Bratton v. City of Detroit,* 704 F.2d 878, 886 (CA 6, 1983).

**53.** *See* the January 17, 1984 statement of the U.S. Commission on Civil Rights reprinted at 52 USLW 2417 (1984). This statement—ironically enough—uses the Detroit Police affirmative action plan upheld in *Bratton* as a model for an unfair and unlawful affirmative action plan. To quote the statement:

> "The U.S. Commission on Civil Rights deplores the city's use of a racial quota in its promotion of sergeants as one of the methods for achieving its laudible objectives."

It is interesting to note that the Commission's opinion was issued just a few days after the Supreme Court denied certiorari in *Bratton, see* —— U.S. ——, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984).

**54.** This has been and will continue to be a very serious discussion. Nevertheless, attorneys and judges familiar with this Court might smile at the statement in the text. Those who are not so familiar with the Court might take a look at the Court's opinions in such cases as *Walker v. Johnson,* 544 F.Supp. 345 (E.D.Mich.1982); *Toins v. Ignash,* 534 F.Supp. 452 (E.D.Mich. 1982); *Taylor v. Collins,* 574 F.Supp. 1554 (E.D. Mich.1983).

**55.** *See Bratton v. City of Detroit,* 704 F.2d 878, 890–892 (CA 6, 1983).

**56.** *See* Sedler, *Racial Preference, Reality and the Constitution; Bakke v. Regents of the University of California,* 17 Santa Clara Law Rev. 329 (1977); Sedler, *Racial Preference and the Constitution: The Societal Interest in the Equal Participation Objective,* 26 Wayne Law Rev. 1277 (1980).

■ Moving on to the second step of the *Bratton* test, the Court will now determine whether the particular affirmative action plan at issue is reasonable. In resolving this inquiry the Sixth Circuit suggested four relevant factors.[57] The four factors are: (1) whether the affirmative action plan is substantially related to the objective of rectifying past discrimination; (2) whether the use of racial classifications reflects the only legitimate method for achieving those objectives in light of the need for a remedy; (3) whether the affirmative action plan is temporary; (4) whether the plan unnecessarily trammels the interests of white candidates for promotion.

It should be noted that *Bratton* indicates that these four factors are not an always applicable guide for resolving the reasonableness inquiry.[58] Nevertheless, the four-factor guide is a very useful starting point. Thus, the Court will now apply the four-factor test.

First, it is easily concluded that the School Board's affirmative action program substantially relates to the objective of remedying past discrimination. The program basically assures that the racial composition of the counselor staff remains approximately equal to the racial composition of the entire secondary staff. This substantially relates to the goal of redressing the underrepresentation of black counselors.

Next, the Court must determine whether the affirmative action plan is the *only*[59] legitimate method of achieving the objective of rectifying the past underrepresentation. Clearly, this inquiry is substantially the same as the "least intrusive means" test that proved to be the grim reaper of the Cal-Davis affirmative action plan struck down in Justice Powell's *Bakke* opinion.[60] As Professor Perry has pointed out, the least intrusive means test virtually assures that all equal protection clause suspect classifications will be struck down.[61] In light of this it is not surprising that Professor Sedler—a strong supporter of affirmative action—has cautioned against the use of this test in affirmative action judicial reviews.[62]

Nevertheless, one of the *Bratton* reasonableness factors is the "only means" test. And this Court, like so many other courts,[63] must conclude that the collective bargaining agreement affirmative action program is not the only means to remedy the underrepresentation of black counselors. Article XIV–I–1(c) speaks of racial quotas. This Court believes that racial quotas are not the only way to solve the problems of black counselors' underrepresentation. Alternatives include, but are certainly not limited to Justice Powell's *Bakke* solution of permitting race to be but one factor in an applicant's file;[64] emphasis on recruiting

57. See Bratton v. City of Detroit, 704 F.2d 878, 892 (CA 6, 1983).

58. See id.

59. See id.

60. See University of California Regents v. Bakke, 438 U.S. 265, 311–317, 98 S.Ct. 2733, 2759–2762, 57 L.Ed.2d 750 (opinion of Justice Powell).

61. See Perry, Modern Equal Protection: A Conceptualization and Appraisal, 79 Columbia Law Rev. 1023, 1036 (1979).

62. See Sedler, Racial Preference, Reality and the Constitution; Bakke v. Regents of the University of California, 17 Santa Clara Law Rev. 329, 335 (1977).

63. See id. See also the reference to Professor Perry's article in n. 61.

64. See University of California Regents v. Bakke, 438 U.S. 265, 317, 98 S.Ct. 2733, 2762, 57 L.Ed.2d 750 (opinion of Justice Powell). To this day Bakke still is the law governing affirmative action college admission programs. Under this rule of law, race alone cannot be the basis of grants or denials of admission to colleges or professional schools.

In spite of Bakke, there are those who believe that the Universities are winking and nodding at the "race as one factor" rule and then carefully admitting a predetermined quota of minorities in exactly the same manner as the Cal-Davis affirmative action program that the Supreme Court struck down in Bakke.

The Court hopes this is not happening. The Tartuffe of the law would be the law school professor who lectures his students in the morning on the devious ways by which the Southern school districts avoided Brown v. Board of Education and then—later in the day—devises strat-

prospective black counselors to the Flint area; and subsidies for educational programs designed to produce black counselors. Because there are alternatives available, this Court concludes that the "only means" prong of the *Bratton* reasonableness test has been violated.

Next, the Court considers whether the affirmative action plan at issue is "temporary." The temporariness test is, of course, a legacy of the Supreme Court's 1979 Title VII *Weber* [65] opinion—perhaps the most important opinion in the history of private sector employment discrimination law.

*Weber* involved a collectively bargained for affirmative action plan instituted at the Kaiser Aluminum Plant in Gramercy, Louisiana. Under the plan, half the places in an in-plant craft training program were reserved for black employees. The *Weber* majority—speaking through Justice Brennan—emphasized that the affirmative action was temporary because

> "preferential selection of craft trainees at the Gramercy plant will end as soon as the percentage of black skilled craft workers in the Gramercy plant approximates the percentage of blacks in the local labor force." [66]

This statement—closely rivalling Justice Blackmun's *Bakke* aphorism for meaninglessness [67]—doesn't really apply to the Marsh case. Here, the Court is faced with an affirmative action provision that seems to perpetually keep the quota of black counselors above a specified rate. Therefore, at least for the life of the collective bargaining agreement, the Article XIV–I–1(c) cannot be said to be temporary. [68]

Finally, the Court considers whether the affirmative action plan unnecessarily trammels the interests of white would-be counselors. If every person in America had an inalienable right to pursue his occupational and professional interests to the utmost without fear of racial discrimination, this Court would hold that plaintiff Marsh's rights were indeed unnecessarily trammeled. Today, however, such a right does not exist for white males. Instead, the *Bratton* opinion dictates that white employees' interests are not unnecessarily trammeled where the challenged affirmative action plan leaves room for a reasonable number of white employees to be promoted or—in this case—to progress to the position of counselor.

The Court must conclude that—under the *Bratton* standard—white counselor applicants are not unnecessarily trammeled. The affirmative action plan requires that the percentage of black counselors approximate the percentage of black teachers in the secondary system. This formula results in a black counselor percentage of 34% (15 black counselors out of 44 counselors). Recalling that a 50% black promotion rate was upheld in *Bratton*, this Court must conclude that the numerical ratio in question does not unnecessarily trammel the interests of white employees.

Thus, on balance, the Court has determined that the affirmative action program is not the only method by which the underrepresentation problem can be solved and that the program is not temporary. On the

---

egies for evading and frustrating the law of *Bakke.*

**65.** *See United Steelworkers v. Weber,* 443 U.S. 193, 208, 209, 99 S.Ct. 2721, 2730, 61 L.Ed.2d 480 (1979). For an incisive analysis of *Weber, see* Meltzer, *The Weber Case: The Judicial Abrogation of the Antidiscrimination Standard in Employment,* 47 U. Chicago Law Rev. 425 (1980).

**66.** *See id.*

**67.** *See* n. 51 and accompanying text *supra.* The *Weber* temporariness statement is meaningless

because it assumes that—without affirmative action—the Gramercy plant's statistics will remain at the right level. But what if the percentage of skilled black craftsmen dips below the percentage of blacks in the Gramercy labor force? Will affirmative action be reinstituted? If so, how can it be said that the Kaiser affirmative action program is temporary?

**68.** Plaintiff Marsh has challenged the Article XIV–I–1(c) affirmative action provision of the 1979–1982 collective bargaining agreement. It is interesting to note that the same provision has been established in Article XIV–I–1(c) of the 1982–1983 collective bargaining agreement.

other hand, the Court has determined that the program relates to its stated objective of combatting black underrepresentation. Furthermore, the Court has determined that the program does not unnecessarily trammel the interests of white employees as that phrase is used in *Bratton.*

In spite of the toss-up, the Court must conclude that the challenged program passes muster under the *Bratton* reasonableness test. The Court simply cannot—and will not—allow its profound and unrelenting personal doubts about the wisdom and constitutionality of race based employee promotion practices to dictate the disposition of this case. The affirmative action program before the Court does not touch nearly as many employees as the *Bratton* plan. Moreover, the promotion from teacher to counselor is not nearly as significant as the promotion from sergeant to lieutenant. These factors militate in support of the conclusion that the Board of Education black counselor affirmative action program is milder than the Detroit Police Department affirmative action program which the Sixth Circuit upheld in *Bratton.*

■ The Court believes that this tips the balance in favor of upholding the constitutionality of the Board's affirmative action program. It is all too clear that the leeway given to affirmative action in the Sixth Circuit is wide enough to save the present affirmative action program from being held unconstitutional. Therefore, it is concluded that the reasonableness prong of the *Bratton* test has been satisfied and that the equal protection clause has not been violated by the displacement of plaintiff Marsh. It follows, of course, that summary judgment must be granted with respect to plaintiff's sections 1981 and 1983 claims.

Having resolved the momentous equal protection clause issue that dominated the case, the Court cannot help but reflect a moment on the language of the clause. Even a cursory reading of the provision leaves the distinct impression that the equal protection clause language is far from susceptible to precise interpretation.

John Hart Ely has taken the position that open-ended constitutional provisions—like the equal protection clause—are an invitation to go beyond the document's four corners to formulate decisive constitutional principles.[69] Professor—now Dean—Ely would not resolve affirmative action the same way as the Court would if the Court were deciding the issue on a clean slate.[70] But the Court recognizes that Professor Ely is abundantly correct in his belief that it is impossible to decide affirmative action on the basis of the language of the equal protection clause. The route which this Court would take would be dictated by its belief that the basic principle lying at the very heart of the equal protection clause is a prohibition against governmental racial recognition. .

This is not to say that government should be forbidden from making vigorous efforts to rectify the residual effects of slavery and Jim Crow discrimination. Unlike some observers, this Court believes that there really is a distinction between goals and quotas. In adhering to the anti discrimination statutory and constitutional mandates, governments should not be faulted for noting the difference between an employer's black labor force and the area's black population. This ratio can then be the point of departure for increased recruitment and educational programs. If this is what was meant by the term "affirmative action," then the Court would heartily approve.

But in the real world goals all too often merge into quotas, and overt racial preferences are put into effect. Affirmative action becomes reverse discrimination, and

**69.** *See generally* Ely, *Democracy and Distrust,* chapter 2 (1980).

**70.** Ely would allow affirmative action because it does not discriminate against a politically defenseless group. *See* Ely, *The Constitutionality of Reverse Racial Discrimination,* 41 U. Chicago Law Rev. 723 (1974). Professor Grano apparently would also allow affirmative action under this theory. *See* Grano, *Book Review,* 26 Wayne Law Rev. 1394, 1397–1406 (1980).

people are disadvantaged because of their race. And the Court deplores this.

But the Court is neither the Supreme Court nor the Sixth Circuit Court of Appeals. No, this is but a district court located within the Sixth Circuit, and it is a court that is absolutely bound to its good faith reading of Sixth Circuit and Supreme Court precedent.

Other judges sitting on the bench of the Eastern District of Michigan have recently decided affirmative action cases. The opinions in these cases—written by respected colleagues, Judge Joiner [71] and Judge Gilmore [72]—do not read like the present opinion.

Nevertheless, the Court felt obligated to write this particular opinion. Affirmative action is not the child of the judiciary. Racial preferences, for better or worse, are the result of years of pressure generated by the Labor Department and other departments of the executive branch of government.[73] But the judiciary has the responsibility to determine the constitutionality of affirmative action, and each judge must be guided by his own interpretation of the law and his own feelings about philosophy and history.[74]

It is justice to inform the present plaintiff—Mr. Stuart Marsh—that this particular court was wracked by misgivings and doubts as it applied the constitutional analysis dictated by the higher courts. Unfortunately for Mr. Marsh—and perhaps for the United States—the practical result of this case is that Mr. Marsh will leave the federal courthouse without an ounce of relief.

The constitution, it is sad to say, did utterly nothing for Stuart Marsh. For this Court was bound by its constitutional oath of office to apply—rather than make—the law of the land. This compelled the Court to place its imprimatur on an explicit act of racial discrimination visited on an American citizen.

American history is a thunderous pronouncement that race consciousness must end. Racial preferences are morally wrong, and it is inevitable that the waters of anger and despair will rise up in the victims of affirmative action. The Court feels sadness and a sense of foreboding as it faces the grim truth that the American constitution has once again been interpreted to allow the government to engage in the rubric of racial entitlement.

## III CONCLUSION AND ORDER

For the reasons stated in the foregoing opinion, the Court hereby GRANTS defendants' motion for summary judgment on all claims asserted by plaintiff in this case.

**71.** See Wygant v. Johnson Board of Education, 546 F.Supp. 1195 (ED Mich.1982).

**72.** See Van Aken v. Young, 541 F.Supp. 448 (ED Mich.1982).

**73.** For an excellent discussion on this subject, see Comment, The Philadelphia Plan: A Study in the Dynamics of Executive Power, 39 U. Chicago Law Rev. 723 (1969). Another extremely worthwhile article is Silberman, The Road to Racial Quotas, Wall St. Journal, August 11, 1977 at 34, col. 4.

The Silberman article should be taken seriously by anyone who is interested in affirmative action. Silberman was employed for some time as a policy maker in the Office of Federal Contract Compliance Programs (OFCCP)—the arm of the Labor Department that monitors the government contract affirmative action program. Silberman discusses how the OFCCP did not originally seek to impose rigid racial preferences. Gradually, however, the OFCCP developed into the greatest wheelhorse of affirmative action in employment.

**74.** The Court must quickly point out what it means by this. In deciding cases—including constitutional cases—a federal judge should not be swayed by his personal philosophy and sense of history. To do so would reflect ignorance of the writings of Professors Grano and Ely. See e.g., Grano, Judicial Review and A Written Constitution, 28 Wayne Law Review 1 (1981); Grano, Ely's Theory of Judicial Review: Preserving The Significance of the Political Process, 42 Ohio State Law Journal 167 (1981); Ely, Democracy and Distrust: A Theory of Judicial Review (1980).

On the other hand, few people would deny that judges have an educative role. This is often—and properly—reflected in the style and dicta of judicial opinions. Although Marsh, Wygant and Van Aken reach the same result, the Marsh opinion obviously reads quite differently from the latter two opinions.

Therefore the Court ORDERS the Clerk to enter judgment for defendants forthwith.

IT IS SO ORDERED.